# Exhibit A

Eugene Y. Turin (SB # 324413)
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002 Ex. 3
Fax: 312-275-7895
eturin@mcgpc.com

Robert K. Shelquist (*pro hac vice* to be filed)
Rebecca A. Peterson, (SB# 241858)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com

Per local Rule, This case is assigned to Judge Treat, Charles S, for all purposes.

*Counsel for Plaintiff and the Putative Class Members*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF CONTRA COSTA

| | |
|---|---|
| N.A., by and through his Guardian BRUCE ALLS, individually and on behalf of similarly situated individuals, <br><br> Plaintiff, <br><br> v. <br><br> NINTENDO OF AMERICA INC., a Washington corporation, <br><br> Defendant. | Case No. C23-00609 <br><br> Assigned to: <br> Department: <br> Complaint Filed: <br><br> **COMPLAINT – CLASS ACTION JURY TRIAL DEMANDED** <br><br> **1.  Declaratory Judgment on Minors' Rights to Disaffirm** <br><br> **2.  Violation of Washington Consumer Protection Act, Wash Rev. Code §§ 19.86.010, *et seq.*** <br><br> **3.  Violation of California Business and Professions Code § 17200, *et seq.*** <br><br> **4.  Unjust Enrichment** <br><br> DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiff N.A. a minor, by and through his Guardian Bruce Alls (collectively "Plaintiff"), through their undersigned counsel, brings this Class Action Complaint against Nintendo of America Inc. ("Nintendo" or "Defendant"), on behalf of himself and all others similarly situated, and alleges the following upon personal knowledge as to his own actions, and upon information and belief as to counsel's investigations and all other matters.

1

## <u>NATURE OF THE CASE</u>

1.      This is an action brought by Plaintiff on his own behalf and on behalf of others similarly situated individuals for the unlawful, deceptive, and misleading trade practices engaged in by Defendant, a provider of some of the most popular video games in the nation.

2.      One of Defendant's most popular games is Mario Kart Tour, a series of racing games with Nintendo's most recognizable characters including Mario, Luigi, Donkey Kong and Captain Toad, which can be downloaded for free on mobile or tablet devices via the Apple or Android app store. Users playing Mario Kart Tour on their devices connect through the internet to Defendant's servers that allow them to play with other users across the country, and the world.

3.      A critical and lucrative aspect of Defendant's Mario Kart game were virtual "Lootboxes" that Defendant calls "Spotlight Pipes". Defendant marketed and sold these Pipes for real-world currency to players, including minors such as Plaintiff. The Pipes were advertised in game as possibly containing valuable unlockable prizes that allowed players to upgrade and/or advance their playing advantage in the game. Nothing players did in game increased or altered their chances of what would be unlocked when a Pipe was opened even though what was won could advance a player. Players such as Plaintiff were not told in advance what is inside any particular Pipe or the odds of winning something which may be contained in the Pipe, and thereby were functionally gambling on the chance of winning some valuable prize.

4.      In addition, Defendant's in-game content, including its Pipes, is non-refundable, regardless of whether the purchases, gambling or otherwise, are made by a minor.

5.      Defendant's unfair, deceptive, or unlawful acts or practices of allowing players, including minors, to pay real-world currency to gamble on winning in-game items, implemented in conjunction with undisclosed "dark patterns" that steered players towards making such purchases and making it particularly difficult to advance in the game otherwise, as well as refusing to provide refunds to minors who made in-game purchases, have through such omissions deceived, misled, and harmed consumers, especially minor children who comprise a large segment of Defendant's player population. Plaintiff and other consumers as well as the public interest have

**CLASS ACTION COMPLAINT**

been impacted or injured as a result of Defendant's practices, including, but not limited to, having suffered out-of-pocket loss.

6. Plaintiff brings this class action lawsuit on behalf of himself, and all others similarly situated. Plaintiff, on behalf of himself and the Class, seeks damages, restitution, declaratory and injunctive relief.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this action pursuant to Cal. Code Civ. Proc. § 410.10 and Article VI, § 10 of the California Constitution.

8. Plaintiff has standing to bring this action pursuant to the Washington Consumer Protection Act, Wash Rev. Code §§ 19.86.010, *et seq.*; the California Unfair Competition Law, California Business and Professions Code § 17200, *et seq.* ("UCL"); and the common law.

9. This Court has personal jurisdiction over Defendant and venue is proper in this Court because a substantial part of the events giving rise to the claims asserted herein occurred in this County.

## PARTIES

10. Minor Plaintiff N.A. and his Guardian, Bruce Alls, are natural persons and are citizens and residents of California.

11. Defendant Nintendo of America Inc. is a Washington corporation with its headquarters and principal place of business located in Redmond, Washington, and has regularly engaged in business throughout the state of California, including in Contra Costa County. Upon information and belief, Defendant directs the marketing and development of its products and services to Contra Costa County, and the unfair, deceptive, or unlawful acts and practices stemming therefrom, from its headquarters located in Washington.

12. At all times relevant to this action, Defendant, in the ordinary course of business as the provider of products and services to individuals who play its Mario Kart Tour video game engaged in acts or practices affecting commerce within the meaning of California consumer

protection laws, and Defendant's deceptive and unfair trade practices alleged herein have affected tens of thousands of consumers within California.

## COMMON FACTUAL ALLEGATIONS

### I.   Lootboxes

13.   Broadly speaking, a Lootbox is a video game microtransaction in which the consumer purchases a reward containing one or more virtual items of differing value or rarity that is assigned at random.[1] Lootboxes are defined in the dictionary as "a box containing a prize of unknown value, especially one offered for sale to players as part of an online game."[2]

14.   Although Lootboxes are advertised and portrayed by video game providers as a vehicle that allows it users to quickly advance further in a game through purchases using real-world currency, the use of Lootboxes and associated omissions in videogames is overwhelmingly misleading and exploitive of consumers like Plaintiff.

15.   Over the past decade Lootboxes have been the epicenter of a host of issues that have caused lawsuits and law reform around world because of their addictive and predatory nature as Lootboxes are often used in free-to-play video games as the main source of revenue for video game providers but players very rarely actually end up getting anything valuable when they purchase a Lootbox.[3,4,5,6] One of the most problematic issues with Lootboxes universally is that despite their use in games that are aimed at and/or played by minor children, Lootbox purchases are often non-refundable—as is the case with Defendant's Mario Kart Tour in-game purchases.[7]

---

[1] www.ftc.gov/system/files/documents/reports/staffperspectivepaperlootboxworkshop/loot_box_workshop_staff_perspective.pdf.
[2] www.collinsdictionary.com/us/dictionary/english/lootbox#:~:text=noun,part%20of%20an%20online%20game.
[3] www.gamechangerslaw.com/blog/italian-antitrust-authoritys-recent-activision-blizzard-lootbox-decision.
[4] https://screenrant.com/lootbox-gambling-microtransactions-illegal-japan-china-belgium-netherlands/.
[5] www.revisor.mn.gov/bills/text.php?number=HF4460&version=0&session=ls90&session_year=2018&session_number=0.
[6] https://www.gamedeveloper.com/business/washington-state-senator-introduces-bill-to-tackle-the-big-loot-box-debate; www.nprillinois.org/statehouse/2021-05-04/illinois-house-approves-adding-warnings-to-video-games-that-include-loot-boxes;
[7] https://accounts.nintendo.com/term/eula/US?lang=en-US

4

**II.**   **Mario Kart Tour's Spotlight Pipes**

16.     Mario Kart Tour is a free to play and download video game for mobile devices in which players race against computer-controlled opponents in a series of races or against other players online.

17.     In order to keep track of a user's progress, an online Nintendo account is required.

18.     The races are divided into a series of "cups," each of which have three courses and a bonus challenge.



19.     Before each race, a player chooses a driver, kart, and glider, and the speed to race at, with 50cc being the slowest, and 200cc being the fastest.

20.     Crucially, using specific characters or equipment can give the player added bonuses in certain races, but they have to be unlocked first; the better the driver, the harder it is to unlock.



21.     Unlike other racing games where the objective is simply to reach the finish line first, Mario Kart Tour utilizes a point-based system, allowing players to unlock experience points to improve their driver and kart, along with increasing the player's driver's level to earn more rewards from races. The player receives some player points for their level if they place in the top three. The player will level up and receive a prize when the gauge is fully filled.



22.     Grand Stars are also given to the player after each race, allowing them to unlock new cups.



23.     Unlocking all rewards, such as Mario Kart Tour characters, gliders, and karts, is a time-consuming effort. For example, you can only collect a maximum of 30 coins per race and

**CLASS ACTION COMPLAINT**

some of the "Daily Selects" - which offer a random collection of items each day that can be unlocked using coins collected during a race - can be expensive.



24.     Mario Kart Tour was purposefully designed in this manner so as to introduce a way for users to spend real cash to unlock things faster by either buying rotating gift sets that include unlockable prices and other collectibles, or by buying in-game currency called "Rubies" in packs costing up to $70 for a chance to unlock random items.



25.     For example, if a user spends five Rubies, they will unlock a random item. Or they can spend Rubies on a special race called "coin rush" that lets them collect hundreds of coins at once.

**CLASS ACTION COMPLAINT**

1      26.    The most popular way to attain any random and unlockable prize is by firing a so-

2  called "Spotlight Pipe" where for five Rubies a player can draw a random item, and receive a new

3  kart character/driver or kart part. Or they have the option to draw 10 (ten) different random items

4  by firing the Pipe 10 (ten) times, for 45 Rubies. That means that a player is paying anywhere from

5  $2.60-$3.32 for a single draw, or $23.40-$29.84 for the ability to draw 10 (ten) items at a time.

  

18      27.    Critically, as with traditional lootboxes, when a player purchases Rubies to draw a

19  Spotlight Pipe, they are not told or shown anything about the gifts or unlockable prizes they will

20  actually receive. In addition to omitting what can be won there is a complete omission on the odds

21  of winning any prize. Furthermore, even though like with most other games utilizing "lootboxes"

22  a player may attain some prizes at a faster rate by having the player pay directly for them by firing

23  a "Pipe," the chances of a player drawing rare valuable items through the Pipe is still designed to

24  be very small. Thus, in order to keep up and gain valuable items to remain competitive in gameplay,

25  players must make large amounts of in-game purchases of Rubies using real-world currency so

26  that they can fire "Pipes".

**CLASS ACTION COMPLAINT**

28.     As with other lootbox games, Defendant's lootbox mechanism capitalized on and encouraged addictive behaviors, akin to gambling. The "Pipe" Lootboxes offered in Mario Kart meet the definition of gambling as set forth in a multitude of gambling statutes and regulations and rely on the same predatory practices designed to induce consumers to spend money on games of chance. Minors are especially susceptible to these addiction-enhancing elements of game design. The experience of acquiring surprise rewards and the associated excitement of uncovering unexpected in-game items holds a strong appeal for minors and reinforces their desire to keep playing and keep getting rewards.

29.     Defendant's Pipe lootbox mechanism has allowed it to obtain profits of almost $300 million dollars while they were in effect.[8]

30.     Acknowledging the deceptive nature of their game design and the dark patterns incorporated within it, Nintendo shut down its Pipe lootbox mechanism in or around September 2022.[9]

31.     Players are now allowed to purchase specific individual items in the Spotlight Shop, where Rubies can be exchanged directly for the specific drivers, karts, and gliders that were attainable by mere luck and chance through the Pipes. Accordingly, the previously omitted odds are now essentially disclosed since the person now knows exactly what is being purchased and for how much.

32.     In sum, during the relevant time period players purchased large quantities of Rubies using real-world currency to fire "Pipes" hoping to receive valuable prizes and/or rewards that would help them advance in the game. However, each Pipe pull was mostly worthless, often filled with valueless prizes and/or rewards that players already had or did not want. Had players known the omitted odds of receiving specific prizes and/or rewards they desired in any particular Spotlight Pipe that they purchased, they would not have made the purchase to fire the Pipe. Given Defendant's superior knowledge that each "Pipe" pull had

---

[8]https://www.vg247.com/nintendo-is-removing-loot-boxes-from-mario-kart-tour-which-has-made-the-company-close-to-300-million
[9] https://twitter.com/mariokarttourEN/status/1565585887303532544

**CLASS ACTION COMPLAINT**

little to no chance of providing any valuable benefit, Defendant was required to disclose the odds associated and its omission of any indication about the real odds was material.

III.     **Dark Patterns & Defendant's Mario Kart Tour Game**

33.     Dark patterns are online user interfaces, that are, amongst other reasons, intended to achieve a financial goal for those who implement them by manipulating users into taking certain actions or making certain decisions against their own interests.[10] Dark patterns are undisclosed and work by exploiting cognitive biases, and "often employ strategies that render the ease of selecting different options asymmetric, cover up the mechanisms by which consumers are influenced, deceive users through acts or omissions, hide relevant information, or restrict choices likely to be popular among consumers."[11] The term "dark patterns" was coined to convey the unscrupulous nature of such design elements, "and also the fact that [they] can be shadowy and hard to pin down."[12]

34.     The FTC has given some examples of "dark patterns" deemed deceptive. This includes "Grinding", or "making the free version of a game so cumbersome and labor-intensive that the player is induced to unlock new features with in-app purchases," which the FTC deems as "coercive action."[13]

35.     As described above, grinding is built into the Mario Kart Tour game. Players that choose not to make Ruby purchases using real-world currency must use the "grinding" mechanism and complete repetitious tasks (i.e. racing to gain small amount of in-game points) if they want to attain any in-game benefits. While each mission (or cup, tournament, or tour) grants the player some in-game benefits such as experience points, levels, equipment, or some other perk without

---

[10] Jamie Luguri, Lior Jacob Strahilevitz, Shining a Light on Dark Patterns, 13 J. Legal Analysis, Issue 1, 2021, Pages 43–109, https://doi.org/10.1093/jla/laaa006.

[11] Jamie Luguri, Lior Jacob Strahilevitz, Shining a Light on Dark Patterns, 13 J. Legal Analysis, Vol. 13, Issue 1, 2021, 43–109, https://doi.org/10.1093/jla/laaa006 (citing Mathur, Arunesh, Jonathan Mayer, and Mihir Kshirsagar. What Makes a Dark Pattern.. Dark? Design Attributes, Normative Considerations, and Measurement Methods, ACM Conference on Human Factors in Computing Systems. 2021 (available at https://arxiv.org/pdf/2101.04843.pdf)).

[12]   Harry Brignull, Bringing Dark Patterns to Light, MEDIUM (June 6, 2021), https://harrybr.medium.com/bringing- dark-patterns-to-light-d86f24224ebf

[13]https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.1 4.2022%20-%20FINAL.pdf

**CLASS ACTION COMPLAINT**

1  having to purchase Rubies and fire a "Pipe," they are not valuable enough to matter unless the
2  player performs an extremely large amount of them. Therefore, players in Mario Kart Tour game
3  are actively looking to "ramp up" their play.

4       36.     Therefore, Grinding is often linked with another dark pattern mechanism such as
5  "Pay to Skip", where a user pays money to skip specific grind-related activities by making in-game
6  purchases that give immediate significant in-game benefit or advantage. This often comes in the
7  form of premium currency (i.e. Rubies in Mario Kart Tour).

8       37.     Relatedly, to take advantage of specific grind-related activities and the dark pattern
9  of "Pay to Skip", Mario Kart Tour also creates artificial scarcity.

10      38.     This method is used by Mario Kart to get you to invest more time and money in the
11  game. Limited-time deals are a common manifestation of this, where the main purpose of the
12  limited time offers is to pressure users into making an impulsive choice and prevent them from
13  weighing the relative values of several options.



26      39.     Finally, the most severe monetary dark pattern are lootboxes where the quantity and
27  quality of valuable objects might vary, and they are less likely to occur than common items. Players

**CLASS ACTION COMPLAINT**

are encouraged to keep trying until they win the desired prize by the randomization of the awards by firing the Spotlight Pipe with undisclosed prizes and a complete omission of the odds of winning any one prize.

40.     As already described above, Mario Kart Tour allowed users to purchase Rubies to fire the Spotlight Pipe one time, or 10 (ten) times. This "Gambler's Fallacy", or the tendency for players to think that past events can affect the future probability of an event occurring, when in reality the undisclosed odds are always the same, was an integral part of Mario Kart Tour's monetary dark pattern to help players skip over certain grind-related dark patterns built into the Mario Kart Tour game.

41.     A similar psychological trait of Defendant's lootbox dark pattern of firing the Spotlight Pipe was for a user to notice patterns or relationships of previous rewards from the Pipe when they were unrelated. For example, a user may mistakenly notice that they get better rewards when they fire the Pipe 10 (ten) times rather than one time, but in reality, the undisclosed odds were always the same.

42.     These intentionally-designed, omission-based dark patterns of "grinding" and "pay to skip" (Spotlight Pipes, Limited Offers, etc.) in the Mario Kart Tour game, have been deemed by the FTC to create coercive action, and consist of unlawful, unfair, or deceptive acts or practices, especially when aimed at minor children.

## FACTS SPECIFIC TO PLAINTIFF N.A.

43.     Plaintiff played Mario Kart Tour from approximately 2021 to 2022 during which time Plaintiff purchased Rubies and fired the Spotlight Pipe numerous times. Plaintiff's purchases in Mario Kart Tour have totaled over $170.00 in real-world currency during that time.

44.     Plaintiff, a minor, was able to make the purchases through his father's credit card that was linked to his Nintendo account. Many of the purchases made by Plaintiff were without his Guardian's permission to do so. Nintendo's charges did not disclose that the money was being used to purchase Defendant's "Pipe" lootboxes.

45.     Throughout his time playing Defendant's Mario Kart Tour game, Plaintiff N.A. was never informed of and was thus unaware of the odds of receiving any reward (including any specific character, kart, glider etc.) when he purchased Rubies with real-world currency to fire the Spotlight Pipe.

46.     Plaintiff was also unaware that he had a right to disaffirm any purchases he made from Defendant.

47.     Plaintiff almost never received any valuable reward from the Spotlight Pipes he had purchased during his time playing Mario Kart Tour and would not have made the amount of in-game purchases that he did had he known the true odds of his being able to obtain any reward from the Spotlight Pipe, or that he would not be allotted a refund.

48.     Plaintiff no longer plays Mario Kart Tour, and wishes that he had never made the purchases that he did and that he obtain a full refund for them.

49.     While Defendant's terms and conditions require minors to obtain their parent's consent to create an account and play Mario Kart Tour, Defendant omitted significant facts and failed to implement sufficient mechanisms for parental consent controls to prevent minors from making unlimited purchases and limiting in-game purchases to players who are over 18.

50.     Based on all of these omissions, minor Plaintiff made numerous in-game purchases that were labeled non-refundable using his Guardian's funds and which his Guardian did not receive any notifications of until the charges were already made. Even then none of the charges described the purchases that were made and that Plaintiff had been essentially repeatedly gambling on winning a valuable in-game item by purchasing Defendant's Pipes.

51.     Had Defendant provided proper parental control and age verification features, minor Plaintiff would not have been able to make any of the purchases that he did.

52.     Furthermore, before hiring counsel in this action, Plaintiff N.A. and his Guardian were not aware of a minor's right to disaffirm and get refunds on any and all in-game purchases without any restrictions. Had Defendant permitted Plaintiff to disaffirm his purchases, he would have done so.

53.     Moreover, each time Defendant updates its Terms and Conditions, Defendant does not require the minor-user to obtain their parent's consent to any renewed or updated terms.

54.     Minor Plaintiff N.A. does not recollect seeing, reading, or agreeing to Defendant's Terms of Use prior to playing Mario Kart Tour and his Guardian also did not see, read, or agree to the terms. Minor Plaintiff N.A. does not consent to arbitrate any of the claims in this action and disaffirms the entirety of any end-user-license agreement, contract or agreement between him and Defendant.

## CLASS ALLEGATIONS

55.     Plaintiff brings this action on his own behalf and on behalf of a Class and one Subclass, pursuant to Cal. Code Civ. Proc. § 382, Cal. Civ. Code § 1781, and Cal. Bus. & Prof. Code § 17203, defined as follows:

The Class:

> All minors located within the United States who, during the applicable limitations period, made a purchase to fire the Spotlight Pipe in the Mario Kart Tour game using real-world currency.

The California Minor Subclass:

> All minors located within the state of California who, during the applicable limitations period, made a purchase to fire the Spotlight Pipe in the Mario Kart Tour game using real-world currency.

56.     **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class and Subclass (collectively, the "Class"). Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class and Subclass members, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class or Subclass.

57.     **Predominance & Superiority.** Absent a class action, most Class and Subclass members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual

actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

58.     **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the Class and Subclass members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class and Subclass members, and making injunctive or corresponding declaratory relief appropriate for the Class and Subclass as a whole.

59.     **Typicality.** The factual and legal basis of Defendant's liability to Plaintiff and to the other Class and Subclass members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class and Subclass. Plaintiff and the other members of the Class and Subclass have suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

60.     **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class and Subclass members such that joinder of all members is impracticable.

61.     **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class and Subclass, and those questions predominate over any questions that may affect individual members of the Class and Subclass. Common questions for the Class and Subclass include, but are not limited to, the following:

(a)     Whether Defendant's unfair, deceptive, or unlawful acts or practices omitting material facts while promoting "Pipes" that contained unknown rewards and in-game benefits was unfair or deceptive to a reasonable consumer;

(b)     Whether Defendant's unfair or deceptive act or practice of using undisclosed "Dark Patterns" to steer players towards making purchases of "lootboxes" designed as "Pipes" was unfair or deceptive to a reasonable consumer;

(c)     Whether Defendant's failure to provide a method for minors or their guardians to disaffirm any purchases violated their consumer rights;

(d)     Whether Plaintiff and the other Class and Subclass members were damaged by Defendant's conduct; and

(e)     Whether Plaintiff and the other Class and Subclass members are entitled to restitution or other relief.

**CLASS ACTION COMPLAINT**

**FIRST CAUSE OF ACTION**
**Declaratory Judgment on Minors' Rights to Disaffirm**
**(On behalf of Plaintiff and the Class and Subclass)**

62.     Plaintiff hereby incorporates the above allegations by reference as though fully set forth herein.

63.     On information and belief, Defendant's Mario Kart Tour game is marketed to players of all ages, including minors.

64.     Defendant purports to enter into and otherwise claims to outwardly accept a contract with a minor when an in-game purchase by the minor is confirmed. There is consideration on both sides as Defendant gives the consideration of virtual in-game content exchanged for consideration of actual money from the minor.

65.     Under California law, and equivalent law in states nationwide, including Washington, minors have the right to disaffirm contracts such as those at issue here. *See, e.g.*, Cal. Family Code § 6700; Wash. Rev. Code § 26.28.030.

66.     Minors may disaffirm or a guardian may disaffirm a contract on behalf of a minor. Through the filing of this lawsuit, Plaintiff disaffirms all in-game purchases he has made through Mario Kart Tour to-date and requests a refund.

67.     Plaintiff further seeks injunctive relief on behalf of the Class and Subclass for future and prospective purchases in Mario Kart Tour to allow for refunds on all in-game purchases made by the Class and Subclass without restrictions.

68.     The purported contracts between Defendant and the members of the Class and Subclass who are minors are voidable—a fact that Defendant denies as evidenced by its denial of the Class and Subclasses' right to be refunded in its Terms of Service.

69.     Accordingly, there is an actual controversy between the parties, requiring a declaratory judgment.

70.     This claim for declaratory judgment is brought pursuant to Code of Civil Procedure § 1060 seeking a determination by the Court that: (a) this action may proceed and be maintained as a class action; (b) the sales contracts between Defendant and the Class and Subclass members

are voidable at the option of those Class and Subclass members or their guardians; (c) if Class and Subclass members elect to void the contracts, they will be entitled to restitution and interest thereon; (d) an award of reasonable attorneys' fees and costs of suit to Plaintiff and the Class and Subclass is appropriate; and (e) such other and further relief as is necessary and just may be appropriate as well.

### SECOND CAUSE OF ACTION
**Violations of the Washington Consumer Protection Act**
**(Wash Rev. Code §§ 19.86.010, *et seq.***
**(On behalf of Plaintiff and the Class)**

71.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

72.     The Washington Consumer Protection Act ("WCPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.010.

73.     Nintendo engaged in the omissions or otherwise committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010 as Nintendo maintains its headquarters in Washington state, received payments from Plaintiff and the other members of the Class and Subclass in Washington state, and designed, managed, and deployed its Mario Kart Tour video game from Washington state.

74.     Defendant's conduct is unlawful under the WCPA because it is in violation of a minor's absolute right to disaffirm contracts.

75.     Furthermore, Nintendo engaged in unfair or deceptive acts or practices through its omissions and conduct described herein in the sale of consumer products and services, such as Defendant's Mario Kart Tour mobile game, and by using undisclosed dark patterns to manipulate and frustrate the minor Plaintiff and members of the minor Class and Subclass in order to induce them into spending real cash for in-game currency and in-game purchases without disclosure and completely omitting the odds of winning any particular prize. As a result most purchases were ultimately worthless.

76.     Defendant's conduct described herein is "unfair" under the WCPA because it violates public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, as Defendant fails to disclose and otherwise omits the actual odds of obtaining any valuable reward by firing the Spotlight Pipe purchase while unlawfully denying minors any refunds they seek for receiving worthless rewards and/or prizes.

77.     Defendant's conduct is also "unfair", under the WPCA, because the user interface in the Mario Kart Tour game incorporates undisclosed dark pattern design elements such as "Grinding" and "Pay to Skip", including related monetary traps through Limited Time Deals and Spotlight Pipes. These tactics are deceptive because they are designed to coerce action and manipulate users, especially minor users, into making certain decisions in the Mario Kart Tour game against their own interests, with real monetary loss to users such as the Plaintiff and other members of the Class and Subclass.

78.     Defendant's conduct also constitutes a fraudulent business practice within the meaning of the WCPA in that Defendant intentionally and knowingly omitted information about the actual odds of obtaining any valuable reward by firing a Spotlight Pipe, when Defendant knew the actual odds of obtaining any valuable reward were always the same and Defendant knew that users, especially minors, are more susceptible to these addiction-enhancing elements of game design (i.e. experience of acquiring surprise rewards and the associated excitement of uncovering unexpected in-game items) which constitutes gambling.

79.     Defendant's conduct is also a fraudulent business practice within the meaning of the WCPA in that Defendant intentionally and knowingly omitted providing information that refunds are allowed for minors without any restrictions under applicable law for any purchases of firing its Mario Kart Tour Spotlight Pipe.[14] Such omissions misled Plaintiff and the other Class and Subclass members and are likely to mislead the public.

80.     Defendant was aware that minors are a significant portion of the population that plays Mario Kart Tour and that they are not capable of entering into binding contracts including

---

**CLASS ACTION COMPLAINT**

for purchases of such things as in-game content like firing the Spotlight Pipe such that Defendant should have provided parental control features and provided for an unrestricted right for minors and their guardians to seek refunds of any purchases made.

81.     Defendant omitted any age verification or parental control features in its Mario Kart Tour game that would have prevented Plaintiff and the other Class and Subclass members from making the purchases that they did, or would have otherwise allowed them or their guardians to seek a refund for their purchases.

82.     Nor has Defendant implemented and has intentionally omitted any feature that provides insight as to what rewards and/or prizes a player will obtain when they make any given purchase of firing the Spotlight Pipe.

83.     Plaintiff and putative Class members acted on Defendant's omissions in that they were unaware that they could disaffirm their contract with Defendant and receive a refund and that they had a very low likelihood of actually obtaining any valuable reward and/or prize from their purchase of Spotlight firing the Spotlight Pipes.

84.     Defendant knew or should have known that its omissions regarding the in-game purchases were false, unfair, deceptive, or misleading acts or practices, especially after the dark pattern design of the Mario Kart Tour game removing the loot box "Pipes" from its Mario Kart Tour game, but Defendant has nonetheless failed to offer to provide Plaintiff and the other members of the Class and Subclass refunds.

85.     Defendant's conduct described herein constitutes an unfair business practice because it violates public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.

86.     As a direct causal link between Defendant's deceptive or unfair trade acts or practices, Plaintiff and the other members of the Class and Subclass, suffered actual damages, including monetary losses.

87.     Plaintiff seeks to enjoin further unfair and fraudulent acts or practices by Nintendo, recover damages, and obtain all other relief allowed under Wash. Rev. Code § 19.86.010.

**CLASS ACTION COMPLAINT**

**THIRD CAUSE OF ACTION**

**Unlawful and Unfair Business Practices in Violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On behalf of Plaintiff and the Subclass)**

88.     Plaintiff hereby incorporates the above allegations by reference as though fully set forth herein.

89.     Plaintiff and Defendant are "persons" within the meaning of the UCL Cal. Bus. & Prof. Code § 17201.

90.     California's Unfair Competition Law, Business & Professions Code, § 17200, *et seq.* ("UCL"), prohibits deceptive acts and practices in the sale of consumer products and services, such as Defendant's Mario Kart Tour video game, and by using dark patterns to manipulate and frustrate Plaintiff and members of the Subclass in order to coerce them into spending real cash for in-game currency and in-game purchases.

91.     Defendant's conduct as alleged herein occurred in the course of trade or commerce.

92.     Defendant's conduct is unlawful under the UCL because it is in violation of a minor's absolute right to disaffirm contracts.

93.     Defendant's conduct is "unfair", under the UCL, because the user interface in the Mario Kart Tour game incorporates undisclosed dark pattern design elements such as "Grinding" and "Pay to Skip," including related monetary traps through Limited Time Deals and Spotlight Pipes. These tactics are deceptive because they are designed to coerce action and manipulate users into making certain decisions in the Mario Kart Tour game against their own interests, with real monetary loss to users such as the Plaintiff and other members of the Subclass.

94.     Defendant's conduct described herein is also "unfair" under the UCL because it violates public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, as Defendant fails to disclose the actual odds of obtaining any valuable reward by firing the Spotlight Pipe purchase while unlawfully denying minors any refunds they seek for receiving worthless rewards and/or prizes.

**CLASS ACTION COMPLAINT**

95.     Defendant's conduct is also a fraudulent business practice within the meaning of the UCL in that Defendant intentionally and knowingly omitted providing information on the actual odds of obtaining any valuable reward by firing a Spotlight Pipe, when Defendant knew the actual odds of obtaining any valuable reward were always the same and Defendant knew that users, especially minors, are more susceptible to these addiction-enhancing elements of game design (i.e. experience of acquiring surprise rewards and the associated excitement of uncovering unexpected in-game items) which constitues gambling.

96.     In addition, Defendant's conduct constitutes a fraudulent business practice within the meaning of the UCL in that Defendant intentionally and knowingly omitted providing information that refunds are allowed for minors without any restrictions under applicable law, and by explicitly representing that no refunds whatsoever are permitted for any purchases of firing its Mario Kart Tour Spotlight Pipe.[15] Such omissions misled Plaintiff and the other Subclass members and are likely to mislead the public.

97.     Defendant was aware that minors are a significant portion of the population that plays Mario Kart Tour and that they are not capable of entering into binding contracts including for purchases of such things as in-game content like firing the Spotlight Pipe such that Defendant should have provided parental control features and provided for an unrestricted right for minors and their guardians to seek refunds of any purchases made.

98.      Defendant did not implement any age verification or parental control features in its Mario Kart Tour game that would have prevented Plaintiff and the other Subclass members from making the purchases that they did, or would have otherwise allowed them or their guardians to seek a refund for their purchases.

99.     Plaintiff and putative Subclass members relied on Defendant's omission in that they were unaware that they could disaffirm their contract with Defendant and receive a refund and that they had a very low likelihood of actually obtaining any valuable reward and/or prize from their purchase of "Spotlight Pipes".

---

[15]https://accounts.nintendo.com/term/eula/US?lang=en-US

**CLASS ACTION COMPLAINT**

100.     Defendant knew or should have known that its omissions regarding the in-game purchases were false, deceptive, and misleading, especially after removing the loot box "Pipes" from its Mario Kart Tour game, but Defendant has nonetheless failed to offer to provide Plaintiff and the other members of the Subclass refunds.

101.     As a direct and proximate cause of Defendant's deceptive and unfair trade practices, Plaintiff and the other members of the Subclass, suffered actual damages, including monetary losses.

102.     Pursuant to Bus. & Prof. Code § 17203, Plaintiff seeks an injunction enjoining Defendant from continuing to engage in the conduct described above as Defendant's wrongful conduct is ongoing.

103.     Plaintiff also seeks rescission and an order requiring Defendant to make full restitution and to disgorge its ill-gotten gains wrongfully obtained from members of the Subclass as permitted by Bus. & Prof. Code § 17203.

104.     Additionally, Plaintiff and the Subclass members seek an order requiring Defendant to pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

## FOURTH CAUSE OF ACTION
### Restitution or Unjust Enrichment
### In the Alternative to Count II & III
### (On behalf of Plaintiff and the Class and Subclass)

105.     Plaintiff hereby incorporates the above allegations by reference as though fully set forth herein.

106.     Plaintiff and the other Class and Subclass members conferred an economic benefit on Defendant through their in-game purchases.

107.     It is inequitable and unjust for Defendant to retain the revenues obtained from in-game purchases made by Plaintiff and the other Class and Subclass members that are refundable or voidable by law, when Defendant does not permit refunds of purchases of its in-game virtual currency and in-game items.

108.    It is also inequitable and unjust for Defendant to retain the revenue obtained from in-game purchases made by Plaintiff and the other Class and Subclass members due to the undisclosed dark patterns incorporated in Defendant's Mario Kart Tour game that were designed to manipulate players and coerce them into making purchases of in-game "Spotlight Pipes" that did not allow Plaintiff and the other Class and Subclass members to see the value of the rewards and/or prize that they were purchasing, obtain a refund for their purchases, and for which Plaintiff and the Class and Subclass members did not receive any valuable items.

109.    Accordingly, because Defendant will be unjustly enriched if it is allowed to retain such funds, Defendant must pay restitution to Plaintiff and the other Class and Subclass members in the amount which Defendant was unjustly enriched by each of their in-game purchases.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, on his own behalf and on behalf of all others similarly situated, the following relief:

1.    For an order certifying this action as a class action, defining the Class and Subclass as requested herein, appointing Plaintiff as class representative and his counsel as class counsel;

2.    Declaring that the sales contracts between Defendant and Plaintiff and the Class and Subclass members are voidable;

3.    Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law;

4.    Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5.    Awarding pre- and post-judgment interest, as allowable by law;

6.    For injunctive relief as the Court may deem proper; and

7.    Awarding such further and other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

**CLASS ACTION COMPLAINT**

DATED: March 17, 2023

Respectfully submitted,

N.A., by and through his Guardian BRUCE ALLS, individually and on behalf of similarly situated individuals

By: /s/ *Eugene Y. Turin*

Eugene Y. Turin (SB # 324413)
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002 Ex. 3
Fax: 312-275-7895
eturin@mcgpc.com

Robert K. Shelquist  (pro hac *vice* to be filed)
Rebecca A. Peterson, (SB# 241858)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com

*Counsel for Plaintiff and the*
*Putative Class Members*

**CLASS ACTION COMPLAINT**